Filed 7/22/22 P. v. Nunez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>PEDRO GALVAN NUNEZ,<br><br>　　　Defendant and Appellant. | F079571<br><br>(Super. Ct. No. VCF322675A) |

APPEAL from a judgment of the Superior Court of Tulare County. Gary L. Paden, Judge.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Robert C. Nash and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Pedro Galvan Nunez and Fernando Prado participated in the gang-related murder of Frank R.[1]  Defendant drove his car into an alley just past where Frank stood while Prado approached on bicycle.  After shooting and killing Frank, Prado jumped into defendant's car and defendant drove them both from the murder scene.  A jury convicted defendant of murder with a gang benefit special circumstance, participation in a criminal street gang, and found true allegations that a principal used and discharged a firearm resulting in death and that defendant committed the crime to benefit a criminal street gang.

Defendant contends on appeal that (1) the trial court erred in failing to instruct the jury that defendant was required to aid and abet the murder before the murder was committed, (2) the trial court abused its discretion by merely referring back to the aiding and abetting instruction when responding to jury question No. 4 as to whether the getaway or driving away is part of the commission of the crime, and (3) the trial court abused its discretion in denying defendant's motion for personal juror identifying information.  In supplemental briefing, defendant contends that we should overturn his murder conviction and remand for retrial in light of recently enacted Penal Code[2] section 1109, which requires bifurcation of the gang enhancement from the trial of the substantive offense when requested by a defendant.

The People respond that the trial court properly instructed the jury, answered its question, and did not abuse its discretion in denying defendant's motion for juror information.  The People also oppose retroactive application of section 1109 and argue that failure to bifurcate was harmless in any event.  We reject defendant's claims of error

[1]    Pursuant to California Rules of Court, rule 8.90, we refer to the victim and some witnesses by their first names and last initials and thereafter by their first names for convenience and/or because they share a surname.  No disrespect is intended.

[2]    Undesignated statutory references are to the Penal Code.

except as to the trial court's order with respect to the release of juror information, and we remand with instructions to the trial court to conduct a hearing on defendant's motion for juror identification information in accordance with Code of Civil Procedure section 237.

## PROCEDURAL BACKGROUND

The District Attorney of Tulare County filed an information on April 22, 2016, charging defendant Pedro Galvan Nunez with murder (§ 187, subd. (a); count 1) with the special circumstances that defendant intentionally killed while an active participant in, and to further the activities of, a criminal street gang (§ 190.2, subd. (a)(22)) and participation in a criminal street gang (§ 182.5; count 2).[3] As to count 1, the information also included special allegations that a principal personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (d), (e)(1)), a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (c), (e)), and defendant committed a felony punishable by life in prison for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)). Defendant pleaded not guilty to the charges and denied all special allegations.

After a four-day trial, on September 24, 2018, the jury convicted defendant of first degree murder (§ 187, subd. (a); count 1) and participation in a criminal street gang (conspiracy) (§ 182.5; count 2) and found true the special circumstance that the murder was committed while defendant was an active participant in a criminal street gang (§ 190.2, subd. (a)(22)). As to count 1, the jury also found true special allegations that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)) and that a principal personally and intentionally discharged a firearm, which caused death (§ 12022.53, subds. (d), (e)(1)).

---

[3]     The information initially titled the crime as "CRIMINAL STREET GANG CONSPIRACY," but on September 17, 2019, the trial court granted the prosecution's motion to amend the information to read "Participation in a Criminal Street Gang" in accordance with the title of section 182.5.

Defendant filed motions for a new trial based on jury misconduct and to unseal discharged jurors' identifying information on December 7, 2018. Defendant supplemented his motion with the declaration of an alternate juror on February 26, 2019. The trial court denied both motions on March 27, 2019.

On June 24, 2019, the trial court sentenced defendant to a term of life without the possibility of parole as to count 1 (§§ 187, subd. (a), 190.2, subd. (a)(22)), plus a consecutive term of 25 years to life (§ 12022.53, subds. (d), (e)). As to count 2, the trial court sentenced defendant to life in prison without the possibility of parole (§ 182.5) and stayed the sentence pursuant to section 654. The court imposed a $1,000 restitution fine (former § 1202.4), a stayed $1,000 parole revocation restitution fine (§ 1202.45, subd. (a)), victim restitution (former § 1202.4, subd. (f)(2)),[4] $80 in court operations assessments (§ 1465.8), and $60 in criminal conviction assessments (Gov. Code, § 70373).

Defendant filed this timely appeal on July 2, 2019.

## FACTS

### I. *Prosecution evidence.*

#### A. **C.M.**

C.M. and her boyfriend, Freddie,[5] drove by Freddie's father's residence on their way to drop off their friend, Kelly M., at a nearby liquor store (the store) to cash a check. C.M. noticed an individual, approximately six houses from the father's residence, who

---

[4] The court ordered defendant to pay $5,000 to the California Victim Compensation Board and that restitution remain open as to both the victims and the California Victim Compensation Board.

[5] Freddie is a nickname for Fernando R., Frank's brother. We shall refer to Fernando R. as "Freddie" to avoid confusion with Fernando Prado, to whom we refer as Prado. No disrespect is intended.

was wearing a hooded sweater, a hat, and one glove.[6] He appeared to be texting on his phone and had a bicycle nearby. C.M. believed his clothing to be strange for such a hot day. Chucky,[7] the resident of the home Prado stood in front of, was also standing outside with Prado and looking toward Freddie's father's home.

After dropping Kelly off at the store, Freddie drove C.M. to his family's house and parked across the street. C.M. intended to check the mail for a letter that she was expecting, but the mailbox was locked, and Freddie's father was not home. However, Freddie's brother, Frank, came out of the house to speak with them and stood in the road on the driver's side of the car. They discussed Frank's baby who was in the hospital.

During the conversation, C.M. saw Prado ride the bicycle from Chucky's house and turn down a street just in front of them. C.M. and Freddie were cautious while in the neighborhood because other individuals had previously tried to hurt Freddie. These individuals had fired shots at the family's house, and C.M. was with Freddie when they threw items at his car and tried to fight him. Frankie saw Prado but told C.M. and Freddie, "Who cares." Five to 10 minutes later, defendant drove his vehicle by slowly while playing loud gangster music.[8] He was driving slower than normal, no more than 15 miles per hour. Defendant stared at them with an angry expression, as if he knew Freddie and did not like him, as defendant drove past them. Defendant did not greet them or wave as he drove past. Defendant's window was open, and loud "Northern" music came from inside the car.

C.M. testified that defendant's car turned down the alley just behind them and stopped while halfway into the street. C.M. could see the car's brake lights. She told

---

[6] This individual was later identified as Prado.

[7] Sergeant Steve Sanchez identified Chucky as Jose Ocampo, a documented Norteño gang member from Brown Pride Catella.

[8] C.M. was familiar with the Norteño street gang and testified that the music was associated with northerners.

Freddie that they should leave, and Freddie told Frank goodbye. C.M. continued to look behind her as they drove off, and Frank turned to walk back across the street. She saw Prado, without his bicycle, come from the alley and start shooting at Frank. Frank grabbed his chest and fell in the middle of the road. C.M. approximated that Prado was 18 to 20 feet from Frank and barely out of the alley. Prado walked from the alley with his arm extended and fired five or six shots.

Freddie tried to turn around but his car did not work in reverse. They left the car in the road, jumped out, and ran towards Frank. C.M. dropped to her knees and picked up Frank's head as he coughed up blood that poured out of his mouth. She identified defendant as the driver of the vehicle both in person and from a photo lineup.

### B. Freddie

Frank was Freddie's younger brother. At the time of Frank's death, Freddie was staying at Kelly's house with his girlfriend, C.M. That day, at approximately 6:00 p.m., Freddie and C.M. drove Kelly to the store, which was near his family's home. Freddie drove through his father's neighborhood on the way and saw several individuals in front of Chucky's house. The individuals were not wearing gang colors. One individual was wearing a hooded sweater, gloves, and a hat (later identified as Prado). Prado began texting on his phone upon seeing Freddie. Prado was standing over a bicycle. While dropping Kelly off at the store, Freddie saw defendant there.

Freddie had known defendant through his own gang associations for more than 12 years but did not know him well. Freddie associated with North Side Catella, part of the Norteños, but dropped out in 2011. Eventually, other Norteños became aware of his status and treated him badly. Freddie and defendant did not have any negative encounters previously. Freddie had been involved in approximately four altercations with other Norteños in the months before Frank's homicide. During one incident, Freddie was parked in the alley near his father's home and four individuals walked up to

6.

him. The four individuals threatened him, so Freddie took off running, went inside his residence, and told Frank what happened. Frank went out to talk to the individuals. They called Freddie "a piece of shit" and "a drop out" and told Frank they would kill Freddie if he did not leave. Frank told the individuals that he would "back [Freddie] up," and a fight broke out. Freddie's father came out of the house, chased one of the individuals, and threatened to call the police if they did not leave.

Apart from that incident, Freddie was shot at while driving approximately two months before Frank was killed. In addition, Freddie was visiting his father's house when it was shot at by individuals in July 2015. A week later, it happened again. On another occasion, Sergio Sanchez[9] used a bat to break Freddie's windshield while Freddie was at a friend's house.

After dropping Kelly off at the store, Freddie drove down the nearby alley and then turned right to park in front of his father's house. Frank came out of the house and they spoke through the driver-side window. While talking, Freddie noticed Prado leave Chucky's house on bicycle, travel down the alley behind Freddie's family's house, and then cross the street behind him into the opposite alley. Freddie noticed defendant's car drive to the cross street in front of him at about the time that Prado crossed the street behind Freddie's car. Freddie was concerned that something was not right.

Defendant drove his car onto the street where Freddie was parked, and Freddie could hear loud "gang music" coming from inside defendant's car. As defendant passed him, Freddie and defendant made eye contact and stared each other down. Defendant was not friendly and did not wave at Freddie, C.M., or Frank. Defendant drove by slowly, braked, and turned into the alley behind Freddie's car and where Freddie last saw Prado. Defendant stopped the car in the alley and Freddie could see the brake lights from his rearview mirror.

---

[9] Sergio Sanchez was a gang member and testified for defendant at trial.

Just as Freddie stopped looking in his rearview mirror, he heard a gunshot. Freddie told Frank to run inside, but as Freddie drove off he saw through his rearview mirror that Frank had stopped in the street. Freddie also saw Prado near a telephone pole at the corner of the alley with his arm extended. Freddie heard five shots, saw Frank fall, and then attempted to turn his car around. Freddie was unable to turn his car around, so he left it on the road and ran to Frank. By that time, Prado and defendant were gone. Frank died in Freddie's arms.

While law enforcement processed the scene, Freddie testified, "there was like some little youngsters, like, throwing gang signs and all that, like." Freddie identified the signs as Norteño gang signs. Freddie later identified defendant from a photo lineup. He also identified Chucky, the individual living down the street from his family's house.

Freddie was later incarcerated and ran into defendant. They shook hands but, at the time, Freddie did not realize that defendant was involved in Frank's murder.

### C. Sarah Saliem

Sarah Saliem, a deputy sheriff of Tulare County, was on patrol on July 30, 2015. She received a 911 dispatch report concerning a gunshot victim in Cutler and responded to the scene at approximately 6:10 p.m. Upon arriving, Deputy Saliem saw Frank lying unresponsive in the center of the road and surrounded by four family members. He had been shot several times, including the left side of his lower abdomen and through his front waistband.

After receiving information from witnesses that one shooter had been riding a bicycle, Deputy Saliem searched for the bicycle and found it just inside the fence in the alleyway and approximately 25 yards from where Frank was lying in the street.

### D. Mandi Van Buren

In 2015, Mandi Van Buren was employed with the Tulare County Sheriff's Office as a field evidence technician. She assisted in processing the scene of Frank's homicide.

8.

Van Buren explained that she documented the scene using a FARO 3D scanner, which is a spinning camera placed throughout the crime scene to collect data points that are later used to create a three-dimensional diagram of the scene. Using the scan, Van Buren testified that the bicycle was located 24.8 meters (approximately 27 yards) from where Frank was lying in the street.

### E. Dr. Gary Walter

Dr. Gary Walter worked as a pathologist for a private company and had performed more than 10,000 autopsies during his career. On August 4, 2015, Dr. Walter performed an autopsy on Frank and determined that Frank died from loss of blood after being shot multiple times. Dr. Walter determined that Frank had been shot four times resulting in six wounds, located in his left chest, left abdomen, left groin, the back of his right leg, and an exit wound on his back. Dr. Walter retrieved two bullet fragments from Frank's rib cage and abdomen.

### F. Retired Detective Christopher Geezer

Retired Detective Christopher Geezer worked for the Tulare County Sheriff's Office and was the lead investigator of Frank's murder.[10] As part of the investigation, Detective Geezer reviewed surveillance video obtained from the store, which was near the murder location. The surveillance video captured the alleyway where defendant's car had stopped. The time stamp of the video was two hours ahead of the actual time.

Because the video lacked sound, Detective Geezer looked for anything that might indicate when the shooting occurred and observed a cat in the alleyway that became frightened and ran away. The video also showed a portion of defendant's car. The video showed that when the cat ran away, defendant's car started to slowly move and, after 10 seconds, traveled through the alleyway very fast A second surveillance camera

---

[10] For convenience, we shall refer to him as Detective Geezer.

recorded a dog that moved toward defendant's car at the same time that the cat ran away. Approximately 11 or 12 seconds later, defendant's car appears in view and can be seen traveling quickly past the camera. Detective Geezer clarified that approximately three seconds after the event that startled the animals (which he believed was the sound of gunshots), defendant's car slowly moved towards the camera and, after 10 seconds, started moving fast.

Detective Geezer interviewed defendant on August 17, 2015. After being read *Miranda* warnings, defendant agreed to speak with Detective Geezer. A recording of the interview was admitted into evidence and played to the jury. During the interview, defendant admitted to being in the gang but said that he was trying to get out. Defendant had a gang tattoo of four dots on the web of his left hand.

Defendant claimed that he did not know that Frank would be shot. Defendant had known Prado for about three months, or maybe as long as six months. Defendant admitted that he had seen Frank earlier on the day of the shooting at the store and greeted him. Defendant said that he was at the store waiting for his cousin to call because he was taking his family to see his cousin and his wife's family "up north," and he bought "sodas and some chips for [his] kids."

Defendant said that he was at the store about 25 minutes before the murder and left because he received a call informing him that his cousin had arrived at defendant's house to see him. When defendant returned to the area, he went around the block, saw Frank and Freddie, said, "hi," and waved. Defendant then turned into the alley and saw Prado. Prado told defendant to wait and then ran. Defendant said that he did not see Prado pull the trigger. Defendant did not see Prado after he turned the corner, but defendant heard very loud gun shots that scared him. Defendant claimed that he took his foot off the brake but zoned out and did not know what was happening. By the time

10.

defendant accelerated, Prado had run to the car, got into the passenger seat, and defendant drove off, although he did not know where to drive.

Defendant claimed that he did not see anything, he was already in the alley, his mind went blank, and then Prado got into the car and told him to "go." He did not know what to do. When Prado entered the car, defendant did not see anything in Prado's hands. Defendant claimed that he did not know what Prado did with the gun and Prado must have put it back where he had it, " 'cause I, when he walked in he just got in, put it in and that's it." Defendant denied knowing what was going to happen and claimed that Frank was not "even a gang member, he didn't even know nothing."

Defendant said that Prado told him that he shot Frank because "he was, uh, drop-out or something like, a snitch, something like that." Prado told defendant that "there were snitches there, they're snitches, I don't know if he was talking about him and his brother or to both of them, I don't know."

Detective Geezer told defendant that the surveillance cameras show defendant's car in the area before the shooting occurred, multiple times. Defendant admitted that he had been driving around the area. He said that he had stopped at Chucky's house about 30 to 40 minutes before the shooting. Defendant said that he stopped by to say hello, and Prado was there as well. Defendant explained, "so I just stopped and said hi, and I just kept driving off, like, just going, and I had went to Orosi and I came back from Orosi, I went around the block again, I just came and instead of going back to the store like I said I was supposed to go back," "I end up going through the alley, and that's my biggest mistake of my life, 'cause I, that feeling I had in my heart, I should have not went through there .…"

Defendant claimed that when he drove into the alley, he saw Prado. Prado asked defendant to wait, dropped the bike, walked around the fence, but defendant did not see what happened thereafter. Defendant denied seeing Prado with a gun. Defendant

11.

admitted that he heard the gun shots and told the detective that he did not leave because "I had some doubt, like, my mind went blank, I didn't know what to do, and by the time I let go of the gas to go, 'cause I wanted to go .…"

Defendant told Detective Geezer that defendant was driving through the alley to go back to the store where he was supposed to meet someone who would sell him marijuana. He also claimed to have contacted several people to obtain marijuana but was not able to connect with anyone. Defendant was going to take the marijuana with him to sell when he took his family north later that evening.

During his testimony, Detective Geezer disagreed with defense counsel and believed there was evidence that defendant knew Prado had a firearm before Prado got into defendant's vehicle. He theorized that defendant could have used his car mirrors to observe and that most people would have turned to look upon hearing gunshots. Detective Geezer testified if Prado was standing near the telephone pole located on the corner, an individual in the alley would be able to see him. Based upon the 3D diagram of the scene and C.M.'s testimony, defendant would have been able to see Prado while he was shooting Frank. Detective Geezer's opinion was also based upon the approximate location of the vehicle as indicated by witness testimony and because the brake lights of defendant's car while in the alley were visible to individuals on the street. However, even if defendant's vehicle was further into the alley, defendant would still be able to see Prado in his rearview mirror.

Detective Geezer also interviewed Prado. Prado had a tattoo over his left eye that read either "Catella" or "Catella Boys." Prado initially lied about his involvement but ultimately admitted that he rode a bicycle up to the alley, left the bicycle in the alley, fired five shots at Frank, froze for a second but then ran back to the alley and got into defendant's car. Prado said that he had been instructed to do the shooting and that Frank, not Freddie, was the intended target. According to Prado, the individual who gave him

12.

instructions had ties with Frank and they had committed small crimes several years before. Recently, however, the individual believed that Frank was talking about those crimes. Prado was trying to increase his status in the gangs and committing a murder would accomplish this quickly.

Prado told Detective Geezer what his phone number was at the time of the shooting. Defendant called the same number after Frank's murder at 6:42p.m.

Detective Geezer showed a photo lineup to Freddie, and Freddie identified Prado as the individual who shot Frank.

### G. Sergeant Hector Rodriguez

Hector Rodriguez, a sergeant with the Tulare County Sheriff's Office, responded to the scene of Frank's murder. He also participated in executing a search warrant at defendant's residence on August 18, 2015. He assisted in seizing the following items from defendant's bedroom: (1) a belt buckle with the number "14," a number signifying Nuestra Familia; (2) a small doll with symbols associated with Norteño gang members;[11] (3) black cotton gloves with a Huelga bird[12] in red; (4) a red shirt bearing a California map stamped on it; and (5) a dealer keychain for the vehicle defendant drove at the time of the murder.

### H. Sergeant Steven Sanchez, Jr.

Steven Sanchez, Jr., a sergeant with the Tulare County Sheriff's Office, testified as an expert regarding the Norteño criminal street gang and its subset, Brown Pride Catella. Sergeant Sanchez had been a peace officer for approximately 14 and one-half years and gained expertise in Tulare County gangs through his assignments in classification and housing at the main jail, on patrol in the gang unit, and in the violent crimes unit.

---

[11] The doll had four dots on the left cheek, Roman numerals XIV on the left arm, and "Catella Boy" written on the bottom.

[12] The Huelga bird is a symbol used by Norteño gang members to identify themselves.

Sergeant Sanchez was a member of several gang investigator organizations and studied and received training regarding the organization of criminal street gangs in Tulare County. In addition, Sergeant Sanchez and other officers obtained information regarding the gangs by conversing with gang members and executing search warrants on their residences.

Several criteria are used to evaluate whether an individual is a member of a gang, and an individual will be validated as a gang member if they meet at least three of the following criteria: (1) admits to gang membership; (2) admits to gang membership for purposes of jail classification; (3) is identified as a gang member by a reliable source; (4) associates with other gang members; (5) possesses or is depicted in photographs while wearing gang colors, using gang hand signs, or posing with other gang members; (6) is a victim or suspect in a gang-related crime; (7) bears gang tattoos; (8) possesses gang clothing; (9) possesses gang material; and (10) is identified in communication with another gang member.

The gangs support themselves through crimes including drug sales, extortion, and credit card fraud. The street gang members report to the hierarchy of gang members in prison. A gang claims a particular territory and controls the criminal activities allowed to take place in that territory. Criminal street gangs use fear and intimidation to accomplish their objectives. Gang members will associate with other members and do not associate with rival gang members or individuals who have dropped out of membership of their own gang.

The Norteño criminal street gang is organized in a paramilitary structure consisting of generals in prison who are Nuestra Familia gang members and a street regiment commander in charge of the county who reports to the prison leadership. In Tulare County, three section leaders work under the street regiment commander and manage the southern, central, and northern part of the county, including Cutler and Orosi.

14.

During an investigation of the Norteño criminal street gang in 2015, Sergeant Sanchez listened to daily communications of Norteño gang members that involved acts of violence including homicide.

Norteños use the color red to identify themselves as well as the number 14 ("N" is the fourteenth letter of the alphabet), numbers one and four, Roman numerals XIV, and the Huelga bird, which is the symbol of the United Farm Workers. In addition, they will use four dots with two lines directly underneath as a representation of the number 14, and Norteño gang members will wear sports clothing of teams with the same letters as the gang subset—such as wearing a Boston Red Socks hat because it has a "B" that can also represent Brown Pride Catella or a Chicago Bears hat where the letter "C" can stand for Cutler.

Norteños must follow orders given by their leadership or they will be ordered to pay monetary fines or be physically assaulted. Once in the gang, members are not permitted to leave, and dropping out of the gang can be punished by death. A member who cooperates with law enforcement would be considered a "drop-out" and could also be punished by death. At the time that Frank was murdered, Sergeant Sanchez had listened to a communication from Pistol Pete Sanchez, the Tulare County Norteño street regiment commander in 2015, instructing members to assault and kill any individual who had dropped out of the gang.

Norteño gang members are broken into subsets according to towns. Each subset has a leader that reports to the section leader working under the street regiment commander for Tulare County. The Cutler-Orosi area is broken into the East Side Orosi, North Side Orosi, and Brown Pride Catella subsets. Members of Norteño subsets work together and share information. The Norteño street gang engages in homicides, assaults with deadly weapons, shooting inhabited dwellings, drugs sales, carjacking, and kidnapping. Sergeant Sanchez investigated an incident in 2013 where two Brown Pride

15.

Catella members stabbed a rival gang member and were convicted of attempted murder and a gang enhancement. In June 2015, Prado and two other Brown Pride Catella gang members were driving when they came upon a drop-out gang member and shot him multiple times. Prado was subsequently convicted of "attempted murder with a street gang."

Sergeant Sanchez knew defendant based upon multiple contacts with him while working in the Cutler-Orosi area. In 2010, Sergeant Sanchez contacted Norteño gang members at a party and instructed them to disburse. Defendant was present and displayed a Norteño gang hand symbol. He also wore a belt with the letter "N." Defendant was arrested and admitted to associating with Brown Pride Catella. Defendant also associated with two other Brown Pride Catella members at the party. That same year, Sergeant Sanchez responded to a vehicle stop and encountered defendant and three other Norteño gang members. During the contact, defendant again admitted his association with the Brown Pride Catella Norteño gang.[13]

Sergeant Sanchez reviewed the photographs taken during the search of defendant's residence and identified several items indicative of gang membership, including a belt buckle bearing the letter "N" and representing the fourteenth letter of the alphabet, a red T-shirt with a map of California oftentimes worn by gang members, black gloves with a red Huelga bird, a toy figure marked with four dots on its face and the Roman numeral XIV, and the doll with the words "Catella Boy." Catella is slang for Cutler, and Brown Pride Catella gang members often identify themselves as Catella Boys.

Sergeant Sanchez also reviewed photographs downloaded from defendant's Facebook account that depict defendant with another Brown Pride Catella member wearing gang clothing, defendant's chest exhibiting the tattoo "T.C." (representing

---

**13** The term "associate" is used to refer to individuals who have been encountered by law enforcement in association with the gang but have not yet met three of the criteria established by the Tulare County Sheriff's Office for gang membership.

Tulare County), defendant's back with a tattoo of the word "Catella," and four dots tattooed on the webbing of defendant's left hand and one dot on the other side of his hand.

Defendant admitted to associating with Norteños from Brown Pride Catella during his interview with Detective Geezer. Prado also possessed tattoos associated with the Norteño street gang, such as "Tulare County," the letter "C" for Cutler, one above his left eye that read "Catella Boys," and one with the Cutler zip code.

Sergeant Sanchez concluded that defendant was an active participant of the Norteño criminal street gang and a member of Brown Pride Catella because he met three or more of the criteria used by the Tulare County Sheriff's Office to document gang membership, he (1) admitted gang membership, (2) associated with other gang members, (3) possessed and was depicted in gang photographs, (4) was involved in gang-related crime, (5) possessed gang-associated tattoos, and (6) wore gang clothing. Sergeant Sanchez further concluded that Prado was also a member of Brown Pride Catella.

Sergeant Sanchez was asked to consider a hypothetical situation that mirrored the circumstances of Frank's murder. He testified the individual who shot Frank would gain status within the gang by killing someone who had stood against the gang to protect a family member that had dropped out of the gang and was perceived to be threat to the gang, and send the message to other individuals that treason would be punished by death. The actions of the driver benefited the gang, and the driver committed the crime in association with a gang.

Sergeant Sanchez also testified that the crime was performed at the direction of the criminal street gang. At the time of the shooting in this case, gang members had been ordered to kill individuals who had dropped out of the gang. Additionally, a gang member will not commit murder with people who are not gang members. Sergeant Sanchez believed it was significant to active gang membership if an individual was

17.

observed associating with gang members just prior to a gang-related crime, such as defendant having seen Chucky the day of the murder. Sergeant Sanchez testified that it would not be unusual for Brown Pride Catella gang members to not wear gang colors and avoid being documented as gang members in light of the gang injunction in effect at the time.[14]

## II. Defense evidence.

### A. Miguel Nunez

Defendant's cousin, Miguel Nunez, testified that on July 30, 2015, he went to defendant's residence because defendant had agreed to obtain marijuana for him. Defendant was not able to contact his sources by phone and left the residence to try to find the drug supplier at approximately 4:30 p.m.

### B. Defendant's Testimony

Defendant acquired his tattoos when he was approximately 15 or 16 years old and, in 2015, he was 23 years old. While three of his tattoos are gang related, defendant testified that he never actively participated in the gang or gang-related crimes. Defendant had, at times, told Sergeant Sanchez that he associated with gang members but never claimed to be a member of the gang. While defendant had gang-related items in his bedroom, they were in his closet because he had stopped associating with gang members after his son was born in 2010 or 2011. On cross-examination, defendant admitted that he sometimes had drinks with known gang members, but he did not commit crimes with them.

Defendant knew Frank who, to defendant's knowledge, was not a gang member. Defendant did not have any negative encounters with either Frank or Freddie.

---

[14] Sergeant Sanchez testified that he authored the Cutler Orosi gang injunction for the Norteños and Sureños and explained that the injunction was essentially a civil lawsuit against the gang for being a nuisance. The injunction included a list of rules for members and became permanent in 2013.

On July 30, 2015, defendant drove by Freddie's car while on his way to the store to find his drug source and obtain marijuana for Miguel Nunez. In the alley, defendant saw Prado. Defendant's drug source was an individual he knew as Pulga, and defendant had been unable to reach Pulga by phone. Defendant called Martin Perez in an attempt to obtain marijuana but did not reach him either. Defendant did reach Sergio Sanchez, who also sold marijuana, and they agreed to meet at the store.[15]

Several hours before the shooting, between 2:00 and 3:00 p.m., defendant had been at the store and saw Frank. They shook hands. Defendant also stopped to talk to Chucky, whom defendant knew because Chucky's father worked with defendant's cousin at an auto shop. Prado was at Chucky's house too, but they did not speak. Defendant testified that he did not know Prado or Chucky very well because he had been living in Visalia for three years. During that time, defendant did not have contact with law enforcement.

Defendant was playing music that day, but it was not related to gang activity. Defendant parked in the alley and approximately 15 yards from the street to wait for Sergio Sanchez to bring him marijuana. He could not see either Frank or Freddie from where he was stopped in the alley. He saw Prado in the alley and rolled down his window. Prado asked defendant to wait for him and defendant assumed that Prado was going to drop his bicycle off at Chucky's house. Defendant did not know what Prado planned to do and had not planned anything with him. Prado was wearing a black thermal shirt and was dressed in nongang-related clothing.

After Prado asked for a ride, defendant was playing with his phone and then heard gunshots. Defendant testified, "I took my foot off the brake. [¶] The car was leaving by

---

**15** Defendant admitted that he had told Detective Geezer that he was not successful in contacting any drug source by phone. In response to the prosecutor's questions, defendant testified that he had not spoken with anyone but knew that someone would be in the alley selling marijuana because "there's always somebody there."

the time I realized anything. When I came to my senses, [Prado] was in the car. All I heard was go, go, go, and I left." Defendant did not see the gun right away because he was focused on driving. Prado had the gun in his lap and defendant did not know if it had been pointed at him. However, defendant was stopped waiting for traffic and did not tell Prado to get out of the car because he was afraid Prado would shoot him. Prado used defendant's phone to make one call without defendant's permission while in the car. Defendant called the number and an individual called back and told defendant not to call again. When cross-examined, defendant explained that the individual called back using a different telephone number. Defendant testified that it took approximately 10 to 15 minutes to drive Prado to where he wanted to go.

Defendant identified the number called by Prado but claimed he did not know who used that telephone number.

Defendant did not contact the police about what happened because he feared retaliation from the gang. Defendant testified that because he had associated with gang members but was no longer doing so, other gang members most likely viewed him as a drop-out. No one had attempted to retaliate against him since 2010, but they would not talk to him.

Defendant later admitted that he had been contacted by law enforcement on February 12, 2013, but he did not admit telling the officer that he associated with Brown Pride Catella. He denied ever telling law enforcement that he was a gang member and said that police always want to claim individuals have admitted to gang membership. Defendant was stopped by law enforcement again on January 23, 2015, while in the company of another gang member but denied that he knew the individual was a gang member.

20.

## C. Sergio Sanchez

Sergio Sanchez is a validated member of the Norteño street gang. He testified that defendant was not a member of the gang. On July 30, 2015, Sergio was contacted by Pulga concerning a drug deal that involved defendant. Earlier that day, Sergio observed defendant and Frank greet each other at the store. Sergio was there concerning a drug transaction and later returned to the area. Sergio was supposed to provide a sample of marijuana for defendant's cousin. Sergio first testified that he intended to meet with Miguel and Pulga, but then testified that he was to meet with defendant. Sergio saw defendant's vehicle, but it left before Sergio could meet with defendant. Sergio testified that he saw someone waving a gun around and the individual pointed the gun at defendant and made him drive the individual from the area.

## D. Robert Swetich

Robert Swetich worked for the Department of Corrections for approximately 26 years and was initially assigned to Pelican Bay State Prison, which was designed to house prison gang members and leaders. Through his employment, he acquired knowledge as to the workings of several prison gangs, including Nuestra Familia. Later, Swetich continued to interview gang members as a private investigator.

As part of his investigation of defendant's case, Swetich conducted surveillance of the area near the shooting and testified he observed drug sales taking place.

Swetich also testified as a gang expert. Swetich testified that it was common for Norteño associates or members to stop involvement with the gang but still frequent their former neighbors and experience only "a little peer pressure attitude with they didn't want them coming around anymore." Swetich reviewed the materials in the case and concluded that defendant was not an active gang member with Brown Pride Catella. He further testified the murder was not done for the benefit of the street gang.

# DISCUSSION

## I. *Defendant was not prejudiced by the trial court's instructions to the jury regarding aiding and abetting.*[16]

Defendant argues the trial court made two errors when instructing the jury by (1) failing to include in the aiding and abetting instruction that defendant "could not be liable for murder if he formed the intent to aid the killer and then aided the killer only after the murder was committed," and (2) failing to provide the same instruction after the jury asked, "Is the 'get away'[—driving away—]considered part of the 'commision [*sic*] of the crime[?]" We disagree that the trial court had a sua sponte duty to provide this instruction to the jury, as we discuss below. While we can envision a scenario where the trial court's response to jury question No. 4 might have permitted the jury to convict defendant even if he formed the intent to assist Prado during the escape and after the murder was complete, we find any errors on this issue were harmless beyond a reasonable doubt.[17]

### A. Background

#### 1. *Initial instructions to the jury.*

Defendant's written request for jury instructions did not include aiding and abetting murder. During the jury instruction conferences, the instructions on aiding and abetting murder were not discussed specifically and defense counsel did not object when the trial court indicated its intent to instruct the jury as to aiding and abetting pursuant to CALCRIM No. 401. Aiding and abetting was also part of the instruction for participation in a criminal street gang (CALCRIM No. 1400), and defense counsel did not object.

---

[16] Because we ultimately find defendant was not prejudiced by any instructional error, we do not reach the People's arguments that defendant forfeited his claims of instructional error by agreeing to the trial court's instructions.

[17] Our analyses of jury instruction issues and whether any error was harmless require us to consider the law of aiding and abetting, the duration of the crime of murder, and prejudice. Because both issues are so closely related, we will consider them together.

As to the crime of murder charged in count 1, the trial court instructed the jury with CALCRIM No. 401, "Aiding and Abetting: Intended Crimes," in pertinent part, as follows:

"To prove that the defendant is guilty of [a crime based on] aiding and abetting, the People must prove that:

"One, the perpetrator committed the crime;

"Two, the defendant knew that the perpetrator intended to commit the crime;

"Three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"And four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to, and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime."

After the trial court instructed the jury as to the elements of murder (CALCRIM Nos. 500, 520), the trial court further instructed as to the elements of first degree murder with CALCRIM No. 521, in pertinent part, as follows:

"The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.

"The defendant acted willfully if he intended to kill.

"The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.

"The defendant acted with premeditation if he decided to kill before completing the act that caused death."

23.

Regarding the intent required for accomplices as to the special circumstance of committing murder while an active participant in a street gang, the trial court instructed the jury with CALCRIM No. 702, in pertinent part, as follows:

> "If you decide that the defendant is guilty of first degree murder, but was not the actual killer, then when you consider the special circumstance you must also decide whether the defendant acted with the intent to kill.

> "In order to prove this special circumstance for a defendant who is not the actual killer, but who is guilty of first degree murder as an aider and abettor, the People must prove that the defendant acted with an intent to kill. [¶] … [¶]

> "If the defendant was not the actual killer, then the People have the burden of providing beyond a reasonable doubt that he acted with the intent to kill [f]or the special circumstance to be true.

> "If the People have not met this burden, you must find the special circumstance has not been proved."

As to count 2, participation in a criminal street gang (§ 182.5), the trial court instructed the jury with CALCRIM No. 1400, in pertinent part, as follows:[18]

> "Three, the defendant willfully assisted, furthered, or promoted felonious criminal conduct[] by gang members either by directly or actively committing a felony offense, or by aiding and abetting a felony offense."

---

[18]     Section 182.5 provides that "any person who actively participates in any criminal street gang, as defined in subdivision (f) of Section 186.22, with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, as defined in subdivision (e) of Section 186.22, and who willfully promotes, furthers, assists, *or benefits from* any felonious criminal conduct by members of that gang is guilty of conspiracy to commit that felony and may be punished as specified in subdivision (a) of Section 182." (§ 182.5, italics added.) Section 182.5 is nearly identical to section 186.22, subdivision (a), except for the italicized language noted above. CALCRIM No. 1400 is the pattern instruction for section 186.22, subdivision (a) and does not include the italicized language. We note that there is no pattern jury instruction for section 182.5.

As to the definition of "willful felonious criminal conduct," the trial court instructed with the definition contained in CALCRIM No. 1400:

"I've already described willful felonious criminal conduct means committing or attempting to commit the following crimes, in this case, murder.

"To decide whether a member of the gang or the defendant committed murder, please refer to that instruction.

"To prove that the defendant aided and abetted felonious criminal conduct by members of the gang, the People must prove that:

"One, a member of gang committed a crime;

"Two, the defendant knew that the gang member intended to commit the crime;

"Three, before or during the commission of the crime, the defendant intended to aid and abet the gang member in committing the crime;

"And four, the defendant's words or conduct did, in fact, aid and abet the commission of the crime."

Defendant, although he did not raise the objection in the trial court, now argues that these instructions were insufficient in that they failed to include that defendant "could not be liable for murder if he formed the intent to aid the killer and then aided the killer only after the murder was committed."

### 2. The trial court's response to jury question No. 4.

During deliberations, the jury sent the trial court jury question No. 1 in writing: "Aiding and Abetting: Inteded [*sic*] Please clarify if 1–3 ALL need to be satisfied OR just one criteria needs to be met [¶] - Along with # 4." After discussion with counsel, the trial court provided the jury with a written response: "As to Instruction 401 [—] all 4 elements must be proved."

25.

The jury sent the trial court jury question No. 4 in writing: "Is the 'get away'[—driving away—]considered part of the 'commision' [*sic*] of the crime[?]" The following discussion occurred:

> "[DEFENSE COUNSEL]: May I refer them back to the aiding and abetting instruction?
>
> "[PROSECUTOR]: I agree. That's for them to determine.
>
> "THE COURT: Well, I wrote this out. I can refer them back to the aiding and abetting instruction, 401, but what I found is this:
>
> "If you find a crime has been committed, the driving away of the perpetrator could be considered aiding and abetting, depending on your finding of the facts.
>
> "Again, please refer to the aiding and abetting instruction, which, I think, is 401.
>
> "[PROSECUTOR]: I'm fine with that.
>
> "[DEFENSE COUNSEL]: I'm not.
>
> "THE COURT: So I'll just tell them refer back to the aiding and abetting instruction.
>
> "[DEFENSE COUNSEL]: Where they have to find all of the elements in order to find him guilty."

Before the answer was provided to the jury, the prosecutor expressed some concern about the response to which the court responded:

> "THE COURT: [Prosecutor], I know exactly what you are saying, but I've found the first way to commit error is to start rephrasing the jury instructions. They have the proper instructions. It's up to them to figure it out.
>
> "The answer to that question is clearly yes. But I think if I were to say that would prejudice the defendant and I don't think that's proper."

The trial court responded to the jury in writing: "Please refer back to the Aiding & Abetting instruction # 401."

Defendant argues that jury question No. 4 was an attempt to determine whether defendant would have been guilty of murder as an aider and abettor if he formed the intent to kill and assisted Prado after Prado shot Frank as defendant was driving Prado from the scene. By not clarifying this point of law, defendant argues the trial court erred and its instructions permitted the jury to find defendant guilty of murder if he only formed the intent to aid and abet the murder while driving Prado from the scene of Frank's shooting. While we agree that the trial court's instruction regarding CALCRIM No. 401 failed to clarify this point of law, we ultimately conclude that any error was harmless beyond a reasonable doubt because the jury ultimately made the correct determination based upon other instructions.

**B.     Standard of Review and Applicable Law**

### 1.     Standard of review.

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Once we have ascertained the relevant law, we determine the meaning of the instructions in this regard. Here the question is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts. [Citations.] 'In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so understood, states the applicable law correctly.' " (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526, first bracketed insertion added.)

"The court has a primary duty to help the jury understand the legal principles it is asked to apply." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) During jury deliberations "when the jury 'desire[s] to be informed on any point of law arising in the case … the information required must be given.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 97, quoting § 1138.) "This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete,

27.

the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*Beardslee*, at p. 97.)

We apply "the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla*, *supra*, 22 Cal.4th at pp. 745–746.) "If a supplemental instruction is given, however, its correctness presents a question of law that we review de novo." (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4.)

### 2. *Aiding and abetting.*

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) " '[A]n aider and abettor's guilt "is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state." [Citation.]' [Citation.] Establishing aider and abettor liability 'requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 146, first & third bracketed insertions added.)

"*Beeman* presupposes that, if a person in fact aids, promotes, encourages or instigates commission of a crime, the requisite intent to render such aid must be formed *prior to or during* 'commission' of that offense. (*People v. Beeman*, *supra*, 35 Cal.3d [at p.] 558 [imposing aider and abettor liability because defendant intended to provide aid 'prior to' commission of robbery]; *People v. Mitchell* (1986) 183 Cal.App.3d 325, 330

[upholding aiding and abetting conviction based on inference of knowledge of robbery 'during the actual taking'].) It is legally and logically impossible to both form the requisite intent and in fact aid, promote, encourage, or facilitate commission of a crime after the commission of that crime has ended." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164, first bracketed insertion added (*Cooper*).)

### 3. *Duration of the crime.*[19]

Cooper was charged based on the theory that he aided and abetted the robbery by driving the getaway car. (*Cooper*, *supra*, 53 Cal.3d at pp. 1161–1162.) He claimed that the evidence proved no more than he was an accessory after the fact because it did not show beyond reasonable doubt that he possessed prior knowledge of, or intent to, aid the robbery. *Cooper* explained that "once all elements of a robbery are satisfied, the offense has been *initially* committed" and a perpetrator "may be found guilty of robbery, as distinct from a mere attempt." (*Id.* at p. 1164.) However, "[f]or purposes of determining aider and abettor liability, the commission of a robbery continues until all the acts constituting the offense have *ceased*."[20] (*Cooper*, at p. 1164.)

To determine the duration of the robbery, "we must necessarily focus on the duration of the final element … asportation." (*Cooper*, *supra*, 53 Cal.3d at p. 1165.)

---

**19** While defendant's case did not involve a robbery, we review *Cooper* for its assistance in providing a framework for determining the duration of murder as well as to explain later why cases involving accomplice liability under a felony-murder legal theory are not applicable to first degree premeditated murder.

**20** To demonstrate "[t]he logic of viewing 'committed' as a fixed point in time for purposes of guilt-establishment and 'commission' as a temporal continuum for purposes of determining accomplice liability," *Cooper* explains that a rape victim might not agree that the rape is completed at initial penetration and the offense does not end until all of the acts that constitute the rape have ceased. (*Cooper*, *supra*, 53 Cal.3d at pp. 1164–1165, fn. 7.) An unknowing defendant "who happens on the scene of a rape after the rape has been initially *committed* and aids the perpetrator in the continuing criminal acts is an accomplice under this concept of 'commission,' because he formed his intent to facilitate the commission of the rape *during its commission*." (*Id.* at p. 1165, fn. 7.)

Asportation satisfies guilt by evidence of slight movement but continues as long as the loot is being carried away to a place of temporary safety. (*Ibid*.) "Therefore, … for conviction of the more serious offense of aiding and abetting a robbery, a getaway driver must form the intent to facilitate or encourage commission of the robbery *prior to or during the carrying away of the loot to a place of temporary safety*." (*Ibid*.)

*Cooper* specifically rejected language defining the duration of the robbery as "continu[ing] through *the escape* to a place of temporary safety" to avoid confusion with the "escape rule," a rule used to define the scope of liability for murder in felony-murder cases, kidnapping in perpetration of a robbery, and "other ancillary consequences of robbery," including enhancement statutes. (*Cooper*, *supra*, 53 Cal.3d at pp. 1166–1167.) While *Cooper* recognized that the escape rule is " 'used in felony-murder cases to determine when a killing is so closely related to an underlying felony as to justify an enhanced punishment for the killing,' " the Supreme Court declined to adopt the escape rule for purposes of determining principal liability as an aider and abettor. (*Id*. at pp. 1167–1168.) "[I]n determining liability as an aider and abettor, the focus must be on the acts constituting the robbery, not the escape," thus "in delineating a crime it is logical to look to the elements that constitute the crime." (*Id*. at pp. 1168, 1169.)

The court noted that the act of carrying away the loot to a place of temporary safety, and thereby the commission of the robbery for purposes of aider and abettor liability, may in many circumstances coincide with the escape to a place of temporary safety for purposes of the felony-murder rule. (See *Cooper*, *supra*, 53 Cal.3d at p. 1166, fn. 10.) But "[i]n certain circumstances, carrying away the loot will *not* coincide with the escape. For instance, the loot may either be abandoned in haste prior to the escape or be carried away by a second getaway car." (*Ibid*.) Where the asportation does not coincide with the escape, "[a] getaway driver, whose intent to aid in the escape is formed after asportation has ceased, cannot facilitate or encourage commission of the robbery." (*Id*. at

30.

p. 1168.) But "one who agrees before (or during) commission of a robbery [up to and including asportation of the property to a place of temporary safety] to be a getaway driver and thereby encourages and/or facilitates the commission of the robbery. In such circumstances, the driver could be liable as an aider and abettor of the robbery." (*Id.* at p. 1168, fn. 12.)

The Supreme Court addressed the issue of the duration of a crime for purposes of aider and abettor liability again in *People v. Montoya* (1994) 7 Cal.4th 1027 (*Montoya*).[21] Montoya argued that the trial court erred in failing to instruct the jury sua sponte that a burglary aider and abettor, prior to or at the time of an entry by the perpetrator, must have formed the intent to commit, encourage, or facilitate the commission of the offense. (*Id.* at p. 1038 & fn. 4.) In order to address that question, the court found it "first must determine the duration of the offense of burglary for purposes of the liability of an aider and abettor, because the intent of an aider and abettor must be formed before or as the offense is being committed."[22] (*Montoya*, at p. 1038.) Based upon *Cooper*, *supra*, 53 Cal.3d 1158, the Supreme Court in *Montoya* concluded, "[T]he commission of a burglary does not terminate, for the purpose of aiding and abetting, upon the perpetrator's

---

**21** As did *Cooper*, *Montoya* observed that the duration of the offense of burglary, as defined for the purpose of assigning aider and abettor liability, need not and should not be identical to the definition pertinent to felony-murder liability or to other "ancillary consequences" of burglary. (*Montoya*, *supra*, 7 Cal.4th at p. 1045, fn. 9, citing & quoting *Cooper*, *supra*, 53 Cal.3d at pp. 1166–1169.) "Accordingly, the liability of an aider and abettor to burglary may not be based upon an intent to commit, encourage, or facilitate the commission of the offense, when such intent arises after the perpetrator has departed from the structure." (*Montoya*, at p. 1045, fn. 9.)

**22** "Because the aider and abettor is subject to the same criminal liability and the same potential punishment as the perpetrator, it is essential to distinguish the act and intent that constitute 'aiding and abetting' the commission of a crime, from conduct that will incur the lesser liability of an 'accessory' to the crime—defined as conduct by one who, '*after a felony has been committed*,... aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony....' " (*Montoya*, *supra*, 7 Cal.4th at p. 1039.)

entry into the structure, but rather continues until the perpetrator's departure from the structure." (*Montoya*, at p. 1040.)

Unlike robbery, the crime of burglary does not include asportation as one of its elements, and thus, for the purpose of aiding and abetting, liability for burglary would not extend to a person who simply aided a burglar in the asportation of the stolen property after its removal from the burgled structure. (*Montoya*, *supra*, 7 Cal.4th at p. 1041, citing *Cooper*, *supra*, 53 Cal.3d at p. 1169 & fn. 13.) Therefore, in determining the duration of burglary for purposes of aider and abettor liability, "the court must take into account the nature of the interests that the penal provision is intended to protect, emphasizing in this regard that both the victim of a crime and a potential aider and abettor frequently will not perceive an offense as 'completed' simply because all elements necessary to establish guilt already have been satisfied." (*Montoya*, at p. 1040.)

The Supreme Court recognized that the burglary laws are primarily aimed at the danger caused by the unauthorized entry itself and designed to prevent situations dangerous to personal safety, but not so much to deter trespass and the intended crime, which are prohibited by other laws. (*Montoya*, *supra*, 7 Cal.4th at pp. 1042–1043.) Because these dangers continue while the perpetrator remains inside the structure, "one who learns that the perpetrator unlawfully has entered with intent to commit a felony or theft, who forms the requisite intent to assist, and who does assist … logically should be liable as an aider and abettor rather than as a mere accessory." (*Id*. at p. 1043.) The court provided the example of an aider and abettor who learns of the perpetrator's earlier entry with the requisite intent, forms his own intent to facilitate that offense, and commences acting as a " 'lookout' " at the point of entry, on behalf of the perpetrator. By enabling the perpetrator to prolong his presence in the structure, the aider and abettor may increase the chance of an encounter between the perpetrator and a returning occupant. (*Id*. at pp. 1043–1044.)

32.

For the purpose of assessing the liability of an aider and abettor, a burglary is considered ongoing during the time the perpetrator remains inside the structure. (*Montoya*, *supra*, 7 Cal.4th at p. 1045.) Therefore, an individual who forms the intent to assist in the commission of the offense only after entry by the perpetrator is guilty of aiding and abetting a burglary as long as the perpetrator also formed the intent to commit the felony before entering the structure. (*Id*. at pp. 1044–1045.) Where the perpetrator makes several entries and exits of the structure, "the aider and abettor may be liable if he or she, with knowledge of the perpetrator's unlawful purpose, forms the intent to commit, encourage, or facilitate commission of the offense *at any time prior to the perpetrator's final departure* from the structure." (*Id*. at p. 1046, italics added.)

### 4. Duration of murder.

Defendant's objections to the initial aiding and abetting jury instructions and to the trial court's response to jury question No. 4 rely upon the argument that his intent to aid and abet the murder must have been formed before the murder was complete. However, neither party has attempted to provide an answer to the question, "when is a murder complete?" Defendant relies upon *People v. Pulido* (1997) 15 Cal.4th 713 (*Pulido*) and *People v. Esquivel* (1994) 28 Cal.App.4th 1386 in support of his argument, but both cases involve accomplice liability for a murder occurring during another felony offense, and defendant has failed to explain why such cases apply to his case, which involves murder and not felony-murder.[23] (See *Pulido*, at p. 716 ["In this case, we address a question regarding the scope of complicity in robbery murder."]; *Esquivel*, at p. 1392 ["Esquivel contends the trial court erred in failing to instruct the jury sua sponte that if Esquivel became an aider and abettor to a robbery after the victim had already been fatally wounded, he could not be found guilty of felony murder. The case was submitted to the

---

**23** *Cooper* and *Montoya* were both careful to distinguish aiding and abetting liability for a crime from felony-murder accomplice liability for aiding and abetting a crime. (See *Montoya*, *supra*, 7 Cal.4th at p. 1045, fn. 9; *Cooper*, *supra*, 53 Cal.3d at pp. 1166–1169.)

33.

jury solely on a felony-murder theory."].) The People respond that defendant's case law is not applicable to aider and abettor liability for murder because it deals with principles of felony-murder liability. We agree that felony-murder cases address the timing of defendant's involvement in another felony offense vis-à-vis when an accomplice commits murder during the offense and does not address the question of a when a murder is complete.

We look to *People v. Celis* (2006) 141 Cal.App.4th 466 (*Celis*) for assistance in answering this question. In that case, Celis was fighting with the victim in her kitchen. (*Id*. at p. 469.) Celis's son came in and struck the victim until he thought she was dead, put the body in the trunk, then cleaned up the kitchen. (*Id*. at pp. 469, 470.) Celis testified that after her son had left, she cleaned the kitchen floor again to protect her son. (*Id*. at p. 470.) On appeal, Celis argued that the trial court erred in not instructing the jury that " 'a murder is complete when the fatal blow is struck, even if the victim lingers for a substantial period of time.' " (*Id*. at p. 471.) Celis argued that without this instruction, the jury could have erroneously found her guilty of murder as an aider and abettor because she cleaned the floor after her son had delivered the fatal blow in the kitchen, but before the victim died. (*Ibid*.)

The court rejected Celis's argument. Because "[t]he crime of murder is defined as 'the unlawful killing of a human being … with malice aforethought' " (*Celis*, *supra*, 141 Cal.App.4th at p. 471, quoting § 187, subd. (a)), "the victim's death is a sine qua non of murder, the crime could not have been 'completed' until" the victim dies (*Celis*, at p. 471 [" '[A] murder ends with the death of the victim.' "], quoting *People v. Esquivel*, *supra*, 28 Cal.App.4th at p. 1397). Therefore, the court held, "a person may aid and abet a murder after the fatal blow is struck as long as the aiding and abetting occurs before the

victim dies."[24] After the victim dies, what would be aiding and abetting legally turns into being an accessory 'after a felony has been committed.' (§ 32.)" (*Celis*, at p. 474.)

Defendant, as did Celis, relies upon language defining when a defendant is liable for an accomplice's murder during the commission of the felony. (See *Celis*, *supra*, 141 Cal.App.4th at p. 473, citing *Pulido*, *supra*, 15 Cal.4th 713, 716.) In *Pulido*, our Supreme Court held a defendant is not liable under felony-murder rules for a murder committed by an accomplice to a robbery if the defendant forms the intent to aid and abet the robbery only after the murder.[25] (*Pulido*, at pp. 716, 729.) *Celis* rejected Celis's attempt to introduce legal principles associated with the felony murder "[i]n a simple murder case, i.e., not involving the felony-murder rule." (*Celis*, at pp. 473–474.)

### C. Analysis

#### 1. *The trial court correctly instructed the jury that defendant had to aid his coparticipant during the commission of the crime.*

As set forth above, in instructing the jury on aiding and abetting as it relates to murder, the court instructed the jury that it must find that "the defendant knew that the perpetrator intended to commit the crime" and "before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime." The key timing issue in aiding and abetting is when defendant's intent to aid and abet is

---

**24** In this case, C.M. testified that she ran from Freddie's car and held Frank after he was shot. At that time, Frank was coughing up blood. Freddie testified that when he ran from his car, defendant and Prado were no longer in sight and Frank died in his arms. As Frank was still alive while defendant drove Prado from the murder scene, and an instruction based upon this legal premise was given to the jury, the evidence was overwhelming that Frank was still alive when defendant assisted Prado's escape.

**25** "At the outset, it should be emphasized we are not concerned here with that part of the felony-murder rule making a killer liable for first degree murder if the homicide is committed in the perpetration of robbery. This case involves only the question of a *nonkiller's* liability for the felony murder committed by another. We are concerned, in other words, not with the felony-murder rule's 'aggravation of culpability aspect,' but with its 'complicity aspect.' " (*Pulido*, *supra*, 15 Cal.4th at p. 720.)

formed. "[A]n intent to help the perpetrator get away, formed before cessation of the acts constituting the felony, constitutes aiding and abetting." (*In re Malcolm M.* (2007) 147 Cal.App.4th 157, 171; see *People v. Gomez* (2008) 43 Cal.4th 249, 256 [to convict getaway driver of aiding and abetting, his intent to facilitate or encourage the crime must be formed before or during the crime].) The jury was properly instructed on this point of law pursuant to CALCRIM No. 401. However, "even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*Montoya*, *supra*, 7 Cal.4th at p. 1047.)

"As noted, defendant did not request any specific instruction with regard to the time the intent to facilitate or encourage the [murder] must have been formed in order to support a finding of guilt on a theory of aiding and abetting. In light of the manner in which the case was tried and argued by the parties, we conclude that the question of the precise time at which the requisite intent of an aider and abettor must have been formed was not an issue that was so 'closely and openly' connected to the facts before the court as to give rise to a sua sponte duty to instruct on the part of the trial court, and that the instructions furnished by the trial court were adequate." (*Montoya*, *supra*, 7 Cal.4th at p. 1048.)

The prosecution's case-in-chief supported the theory that defendant was aware of Prado's intent to shoot and murder Frank and defendant formed the intent to assist Prado in that enterprise prior to its commencement. Witnesses observed defendant driving through Frank's neighborhood and meeting with Prado and Chucky shortly before the shooting. Both defendant and Prado arrived at the alley separately as if by plan and positioned themselves behind Freddie's car.

Nor did the prosecutor's argument promote the theory that defendant formed the intent to facilitate the murder at some point after the shooting. (See *Montoya*, *supra*,

7 Cal.4th at pp. 1048–1049, citing *People v. Brown* (1988) 45 Cal.3d 1247, 1256 [evaluation of arguments of counsel appropriate where the issue is whether the interplay of argument with individually proper instructions produced a distorted meaning].) In closing, the prosecutor first argued that the evidence proved Prado and defendant planned the crime in advance and defendant facilitated the murder by knowingly meeting Prado in the alley and waiting for Prado to shoot Frank, intending to help Prado with the murder by helping him escape.

The prosecutor then argued to the jury that defendant was guilty of murder even if they believed that Prado and defendant did not plan the murder before defendant drove into the alley and encountered Prado, who asked defendant to wait there. The prosecutor argued that even without advance planning, the evidence showed that defendant formed the intent to help Prado with the shooting before the final shot was fired and facilitated the murder by helping Prado escape. According to the prosecutor, the evidence showed that Prado asked defendant to wait in the alley, but defendant would have known once the first shot was fired that Prado planned on killing Frank or Freddie. After that first shot, defendant had 13 seconds to make the decision to help Prado while the additional shots were fired. During that time, defendant knowingly continued to wait for Prado, and, after the first three seconds, defendant slowly drove forward, indicating his intent to continue to wait for Prado and to help Prado escape. The prosecutor explained to the jury: "[T]he intent was formed at a minimum—which I don't believe for a second, at a minimum the intent was formed while the crime was occurring. And [defendant] still gets [Prado] out of there. [Defendant] knows [Prado]'s doing this crime. [Defendant] knows not after the fact. I'm talking about the crime is happening, and I can hear the shots, and I'm continuing to agree to help him. That's aiding and abetting."

In contrast to the prosecutor's position that defendant was aware of the intended murder from the outset, the principal theory presented by the defense was that defendant

37.

was in the alley to purchase marijuana and encountered Prado, who asked him to wait there, and defendant was unaware of the murder during its commission. Defense counsel posited that defendant would not have been able to see what Prado was doing in the street and it was possible defendant believed Prado was the victim of a shooting. He argued that defendant did not know what was happening even after he heard the shots and when Prado entered defendant's car with a gun, defendant was too afraid not to leave the scene. Defense counsel argued that defendant did not intend to assist in Prado's unlawful purpose and pointed to the lack of direct evidence that defendant said anything that could be construed as promoting, encouraging, or instigating the commission of the offense.

"In view of the evidence presented and the arguments advanced by the parties, the significance of the precise time at which defendant must have formed the requisite intent in order to be liable as an aider and abettor was not an issue 'closely and openly' connected with the case." (*Montoya*, *supra*, 7 Cal.4th at p. 1050.) "Under these circumstances, the trial court was under no obligation to sift through the evidence to identify an issue that conceivably could have been, but was not, raised by the parties, and to instruct the jury, sua sponte, on that issue." (*Ibid.*)

Therefore, we find that the instructions given the jury were adequate in light of the evidence presented and the trial court was under no obligation further to instruct the jury sua sponte. There was no instructional error.

### 2. The trial court's response to jury question No. 4.

Although the trial court need not always elaborate on the standard instructions, the trial court nevertheless has "a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) Some courts have interpreted this to mean that "a trial court's response to a jury question can be erroneous even if it does not technically misstate the law." (*People v. Fleming* (2018)

38.

27 Cal.App.5th 754, 766, citing *People v. Nero* (2010) 181 Cal.App.4th 504, 518 [trial court misinstructed the jury by rereading two instructions in response to jury's questions which had demonstrated confusion and specifically sought clarification of those instructions].)

Jury question No. 4 asked whether the getaway or driving away was part of "the 'commission' of the crime." This phrase appears in the jury instructions both to define defendant's intent ("[t]hree, before or during *the commission of the crime*, the defendant intended to aid and abet the perpetrator in committing the crime" [italics added]), as well whether the aid that defendant provided, i.e., driving away, helped Prado's "commission of the crime" ("[a]nd four, the defendant's words or conduct did, in fact, aid and abet *the perpetrator's commission of the crime*" [italics added]). Jury question No. 4 in this case leaves room for doubt as to the source of the jury's confusion.

The trial court obviously believed that the jury was attempting to determine whether aid provided after the actual shooting was sufficient under the instructions. The trial court originally wanted to advise the jury that the getaway could be part of the murder if defendant formed the intent to assist Prado before or during the commission of the murder. This would have been legally correct as "one who is present for the purpose of diverting suspicion, or to serve as a lookout, or to give warning of anyone seeking to interfere, or to take charge of an automobile and to keep the engine running," or "stays in an automobile and enables those who are robbing to make a successful 'getaway' is as much a principal and aids and abets the crime as completely as though he [or she] were present and assisted in the actual taking of the property." (*People v. Silva* (1956) 143 Cal.App.2d 162, 169.) But "if a person in fact aids, promotes, encourages or instigates commission of a crime, the requisite intent to render such aid must be formed *prior to or during* 'commission' of that offense." (*Cooper*, *supra*, 53 Cal.3d at p. 1164; see *Montoya*, *supra*, 7 Cal.4th at p. 1039.)

39.

Unlike robbery, murder does not continue until the perpetrator reaches a place of temporary safety. Rather the murder was complete either when the last bullet was fired or when Frank died. " '[A] murder ends with the death of the victim.' " (*Celis*, *supra*, 141 Cal.App.4th at p. 471.) "If [defendant] could be guilty of the murder only if he formed the intent to commit or aid and abet the crime *before* or *during* its commission, the jury needed to know how long the commission of the crime continued—until the last shot was fired, or when the perpetrator had reached a place of safety?" (*People v. Fleming*, *supra*, 27 Cal.App.5th at p. 767.) None of the instructions given addressed this point. Failure to clarify this point for the jury, if that was the intent of the question, authorized a murder conviction even if the jury found defendant formed the requisite intent and rendered aid only after Prado fired the last shots or Frank died. (See *ibid*.)

Nevertheless, even if the trial court erred in responding to jury question No. 4, defendant has failed to demonstrate prejudice from the error, as we conclude next.

### 3. *Harmless error.*

We need not decide whether the trial court erred in failing to instruct the jury as to the duration of the crime of murder for purposes of determining whether defendant formed his intent to aid and abet "during the commission of the crime." Even assuming the trial court should have defined the duration of murder for the jury, we conclude that any error was harmless under the standard articulated in either *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) (error is prejudicial unless it appears beyond a reasonable doubt that the error did not contribute to the verdict) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) (error is prejudicial if it is reasonably probable the defendant would have obtained a more favorable result absent the error).

"Harmless error analysis is appropriate when, in the circumstances, it can be said that assuming instructional error, ' "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given

instructions." ' " (*People v. Scully* (2021) 11 Cal.5th 542, 594; see *Pulido*, *supra*, 15 Cal.4th at pp. 726–727 [felony-murder jury instructions omitted that the defendant was required to have aided and abetted the underlying crime before or during the victim's murder but finding error harmless where robbery-murder special circumstance contained the missing element and found by the jury].)

Defendant's jury was instructed as to the elements of first degree murder with CALCRIM No. 521, in pertinent part, as follows: "[D]efendant acted with premeditation if he decide[d] to kill *before completing the act that caused death*." (Italics added.) In the verdict, consistent with this instruction, the jury found that defendant was guilty of murder and the "degree to be First degree MURDER." By its verdict, the jury thus found—explicitly, unanimously and necessarily—that defendant's intent to kill was formed before completing the act that caused death.

Therefore, we conclude the jury clearly rejected defendant's testimony that he had not been driving around the neighborhood looking for Freddie and Frank before the shooting. The jury also must have concluded that defendant and Prado arranged to travel to the alley separately to avoid suspicion, they met in the alley by plan, and the plan entailed defendant waiting for Prado to drive him from the area after the shooting. Therefore, any error in the trial court's instruction was harmless beyond a reasonable doubt in light of the jury's finding on the issue of premeditation, an issue upon which the jury was properly instructed.

## II. The trial court erred in denying defendant's request for juror identifying information without a hearing.

### A. Background

On December 7, 2018, defendant filed a motion for new trial based upon jury misconduct and an "EX-PARTE REQUEST TO UNSEAL DISCHARGED JUROR'S IDENTIFYING INFORMATION" pursuant to Code of Civil Procedure section 237,

subdivision (b). The motion was supported by the declaration of counsel that an alternate juror stated that she observed another juror write "GUILTY BY ASSOCIATION" in his notes at a time in the trial when evidence was being introduced. The declaration also provided that a juror named "Serena" claimed another juror approached her and asked whether she was worried. When Serena asked why she would be worried, the juror replied, "About retaliation because the defendant is a such a lowlife," and suggested Serena "should excuse [her]self from this jury, if [she was] such a Northern sympathizer."

Defense counsel filed a declaration from an alternate juror on February 26, 2019. The alternate juror stated that she observed a juror write "GUILTY BY ASSOCIATION" during the presentation of evidence. The alternate juror had spoken with a juror who deliberated, named Serena, and learned that the juror who made the notation of guilt declared his belief in defendant's guilt at the outset of deliberations.[26] The alternate juror also stated that another juror had approached her during the trial and asked whether she was worried "[a]bout retaliation because the defendant is a gang member and all gang members are lowlifes anyway."

The trial court held a hearing on the motion for new trial and request for jury information on February 26, 2019. Defense counsel requested a continuance in order to obtain a declaration from one of the jurors who participated in deliberations. The trial

---

[26] The alternate juror declaration conflicts with the attorney's declaration in that the attorney's declaration indicated that Serena told the alternate juror that Serena had been approached by the other juror who made the comments. In the alternate juror's declaration, she herself had the conversation with the other juror.

court granted the request. On March 27, 2019, the trial court held a further hearing and denied both requests:[27]

> "The Court does not find good cause to release the juror information. As stated before, the names were provided to counsel at the time of jury selection. The gang component was discussed with potential juror members during jury selection. I don't find any good cause to either disclose the information or to grant a new trial. So both of those requests are denied."

## B.     Standard of Review and Applicable Law

After the recording of a jury's verdict in a criminal trial, the court must seal "personal juror identifying information" such as jurors' names, addresses, and telephone numbers. (Code Civ. Proc., § 237, subd. (a)(2); see *People v. Munoz* (2019) 31 Cal.App.5th 143, 165 (*Munoz*).) Following the recording of a jury's verdict in a criminal proceeding, a defendant's counsel may petition the court pursuant to section 237 of the Code of Civil Procedure for access to personal juror identifying information within the court's records "necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (Code Civ. Proc., § 206, subd. (g).) "The court shall consider all requests for personal juror identifying information pursuant to [Code of Civil Procedure s]ection 237." (*Ibid*.)

A petition pursuant to Code of Civil Procedure section 237 the must be supported by a declaration establishing good cause for the disclosure. (Code Civ. Proc., § 237, subd. (b); *People v. Johnson* (2015) 242 Cal.App.4th 1155, 1161–1162.) To demonstrate good cause where a petition for disclosure is to support a motion for new trial based on juror misconduct, a defendant must set forth a sufficient showing to support a reasonable belief that misconduct occurred and that further investigation is necessary to provide the

---

[27]     Although the trial court commented that it received "an additional declaration from a juror," the record contains only the juror declaration filed on February 26, 2019. Defense counsel's argument during the hearing relies only upon facts from the February 26, 2019 juror declaration.

court with adequate information to rule on a motion for new trial. (*Munoz, supra*, 31 Cal.App.5th at p. 165.) A defendant establishes good cause for the disclosure of juror information by showing "that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 493.) The alleged misconduct must be of such character as is likely to have influenced the verdict. (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.) There is no good cause where the allegations of misconduct are speculative, conclusory, vague, or unsupported. (*Munoz*, at p. 165.)

The trial court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause unless there is a compelling interest against disclosure.[28] (Code Civ. Proc., § 237, subd. (b).) "Compelling interests include jurors' safety and the need for finality if a long period of time has elapsed since trial."[29] (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 382.)

We review a trial court's denial of a petition for the disclosure of juror information for abuse of discretion. (*Munoz, supra*, 31 Cal.App.5th at p. 165.)

### C.    Analysis

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors." (*People v. Nesler* (1997) 16 Cal.4th 561, 578.) "An impartial juror is

---

[28]    If a prima facie showing of good cause is made, the court sets a hearing, notifies each affected former juror, and any affected former juror may appear in person, in writing, by telephone, or by counsel to protest the granting of the petition. (Code Civ. Proc., § 237, subds. (b), (c).) After the hearing, the records shall be made available as requested in the petition, unless the court sustains a former juror's protest. The court "shall" sustain such a protest if, among other reasons, "the juror is unwilling to be contacted by the petitioner." (*Id*., subd. (d).) At the hearing, the trial court can ascertain whether the allegation is credible by questioning jurors.

[29]    While the trial court recognized the possibility of a compelling interest in an earlier hearing due to the nature of the case, the trial court did not mention this as a basis for its decision not to disclose the juror identifying information.

someone 'capable and willing to decide the case solely on the evidence' presented at trial." (*Id*. at p. 581.) A trial court is required "to admonish the jurors not 'to form or express any opinion about the case until the cause is finally submitted to them,' a juror who prejudges a case and so fails to deliberate is also guilty of misconduct." (*People v. Linton* (2013) 56 Cal.4th 1146, 1194.) Furthermore, "[j]urors are prohibited by law from discussing the case until all the evidence has been presented, the trial court instructs the jury, and the jury has retired to deliberate." (*People v. Wilson* (2008) 44 Cal.4th 758, 838.)

Defendant's petition was supported by the declaration of an alternate juror that another juror had written a note that said, "GUILTY BY ASSOCIATION." We agree that the juror's notation of that concept is too vague to warrant further investigation as the testimony and issues at trial involved evidence of defendant's association with gang members as evidence of his participation in the gang, and it would be too speculative to ascribe misconduct to this notation. However, the alternate juror also told of her first-hand encounter with another juror who, prior to deliberations, stated the belief that defendant was a gang member and that she believed she had reason to fear retaliation.

A reasonable inference from the juror's comments is that the juror had already decided that defendant was an active participant in a gang (one of the charges against defendant). The juror's comments could indicate not only that she had prejudged defendant, but that she was also biased against defendant due his possible gang membership. While not as unequivocal a statement as found in cases where misconduct has been found, the petition and accompanying declaration sufficiently showed, for purposes of making a prima facie case, possible misconduct by the juror if she made the statement as alleged and depending upon her intended meaning. (See *In re Hitchings* (1993) 6 Cal.4th 97, 113 [allegations that before individual was picked as a juror she "expressed the opinion that petitioner was guilty" would show prejudgment]; *People v.*

45.

*Brown* (1976) 61 Cal.App.3d 476, 479, 480 [juror statement during prosecution case that " ' "[h]e is guilty" ' " and " ' "[t]here is no doubt about it" ' " showed improper prejudgment]; *Deward v. Clough* (1966) 245 Cal.App.2d 439, 443, 444 [prejudgment when juror stated on last day of trial, " ' "I don't see why they don't open up the jury room now. We could bring in a verdict already." ' "].)

Once good cause is shown, absent a countervailing showing of a compelling interest in nondisclosure, a subsequent hearing under Code of Civil Procedure section 237 was required. Because there was nothing in the record to establish a compelling interest against disclosure, defendant was entitled to a hearing. The trial court appeared to apply the same standard to the petition that was applicable to the ultimate question of whether a new trial is in order. Accordingly, it was an abuse of the trial court's discretion not to conduct a hearing under Code of Civil Procedure section 237.[30]

In light of the alternate juror's declaration, it is reasonably likely defendant could obtain admissible evidence of misconduct if he were to identify and interview the juror who spoke with the alternate. Defendant, therefore, made a prima facie showing of good cause for the release of juror information, and the court abused its discretion by failing to conduct a hearing under Code of Civil Procedure section 237, subdivision (c).[31]

For these reasons, we will reverse the trial court's order denying defendant's petition for the disclosure of identifying juror information and direct the trial court to set

---

[30]    The fact that a hearing is held, of course, does not necessarily result in the release of the juror personal identifying information. Affected former jurors are to be given notice of the hearing and an opportunity to oppose the unsealing of the information. (Code Civ. Proc., § 237, subds. (c), (d).)

[31]    The court held a hearing on defendant's motion, but there is nothing in the record indicating it provided notice to the jurors and an opportunity to object to the release of their information, as required under Code of Civil Procedure section 237, subdivision (c). Instead, the court only considered whether defendant made a prima facie showing of good cause for the release of juror information.

46.

the matter for hearing pursuant to subdivisions (b) and (c) of Code of Civil Procedure section 237.**32**

### III. *Section 1109 does not require reversal of defendant's murder or participation in a criminal street gang (conspiracy) conviction.*

#### A. Background

Defendant filed several in limine motions but did not address bifurcation or severance of any of the charges. The prosecution, however, filed a written objection to bifurcation. During the in limine motions hearing, the trial court stated, "I don't intend to bifurcate the gang enhancements. I know that's over your objection, [defense counsel]." Defense counsel responded, "I wasn't asking for bifurcation."

Effective January 1, 2022, Assembly Bill No. 333 (2021–2022 Reg. Sess.) amended section 186.22 (Stats. 2021, ch. 699, § 3) and added section 1109 (Stats. 2021, ch. 699, § 5) to the Penal Code. Section 1109, subdivision (a) provides that, upon request by the defense, a gang enhancement charged under subdivision (b) or (d) of section 186.22 shall be tried separately after determination of the defendant's guilt of the underlying offense. Section 1109, subdivision (b) provides that a violation of section 186.22, subdivision (a) shall be tried separately from all other charges that do not require gang evidence as an element of the offense.

Defendant claims that section 1109 is retroactive and we should reverse his murder conviction because it was tried with the special circumstance allegation and gang and firearm enhancements. The People contend that defendant forfeited this contention

---

**32** The trial court is further directed to provide defendant the opportunity to file a motion for new trial on the grounds of jury misconduct within a reasonable time after the conclusion of the hearing, should defendant so desire. Nothing in this decision is intended to be, nor should be construed as an expression of any opinion on whether prejudicial juror misconduct occurred in this case or whether a motion for new trial should be granted.

by not requesting bifurcation below, that section 1109 operates prospectively only, and that even if bifurcation was required, any error was harmless.

Two cases have held that section 1109 is not retroactive. (See *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65; *People v. Perez* (2022) 78 Cal.App.5th 192, 207.) Three cases have held that section 1109 is retroactive. (See *People v. Burgos* (2022) 77 Cal.App.5th 550, 564–569, review granted July 13, 2022, S274743; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1130 (*Ramos*); *People v. Montano* (2022) 80 Cal.App.5th 82, 89; but see *Burgos*, at p. 569 (dis. opn. of Elia, J.) [contending that section 1109 is not retroactive].)

We assume, without deciding, that section 1109 is retroactive because we find any error in failing to bifurcate was harmless. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 480.)

## B.   Harmless Error Review

Defendant argues that the failure to bifurcate trial of the murder charge from the special circumstance allegation and the firearm and gang enhancements is a structural error not amendable to harmless error review. We reject that contention. When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. (*Watson*, *supra*, 46 Cal.2d at pp. 836–837.) Federal constitutional errors require reversal unless the beneficiary of the error can show it was "harmless beyond a reasonable doubt." (*Chapman*, *supra*, 386 U.S. at p. 22.) But the failure to bifurcate the gang enhancement allegations from the substantive offenses or sever charges will only violate defendant's constitutional due process rights if, unlike this case, it rendered his trial fundamentally unfair. (*People v. Mendoza* (2000) 24 Cal.4th 130, 162 [even if severance ruling correct when made, reversal required if joinder

resulted in " 'gross unfairness' " amounting to denial of due process], superseded by statute on other grounds as explained in *People v. Brooks* (2017) 3 Cal.5th 1, 63, fn. 8.)[33]

The United States Supreme Court has recognized that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error. (*Chapman*, *supra*, 386 U.S. at pp. 23–24; *McCoy v. Louisiana* (2018) 584 U.S. ___,___ [138 S.Ct. 1500, 1511, 200 L.Ed.2d 821, 833] ["Structural error 'affect[s] the framework within which the trial proceeds,' as distinguished from a lapse or flaw that is 'simply an error in the trial process itself.' "].)[34] Structural errors go to the very reliability of a criminal trial as a vehicle for determining guilt or innocence and are reversible per se—a biased judge, total absence of counsel, the failure of a jury to reach any verdict on an essential element. (*People v. Anzalone* (2013) 56 Cal.4th 545, 554.) However, an error occurring during the presentation of the case to the jury is a trial error that can be assessed in the context of the other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt. (*Ibid.* ["For example, it

---

[33]    When the gang evidence is admissible for purposes other than the gang enhancements and fully intertwined with the underlying facts—as it was here—a defendant's ability to satisfy the high burden to demonstrate prejudice is rare. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049–1050 ["[t]o the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled"].) Concluding, as we do below, that the gang evidence was relevant to an issue in the case, we reject defendant's reliance upon *Bruton v. United States* (1968) 391 U.S. 123, 131, footnote 6 and his argument that the admission of irrelevant and incompetent evidence violated his federal constitutional right to due process.

[34]    Structural errors include the total deprivation of the right to counsel (*Gideon v. Wainwright* (1963) 372 U.S. 335, 343), a biased trial judge (*Tumey v. Ohio* (1927) 273 U.S. 510, 533), unlawful exclusion of grand jurors based on race (*Vasquez v. Hillery* (1986) 474 U.S. 254, 262–264), denial of self-representation at trial (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 177, fn. 8), denial of right to a public trial at a suppression hearing (*Waller v. Georgia* (1984) 467 U.S. 39, 49), a defective reasonable doubt instruction (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 281), and a defendant's right to have all critical stages of a criminal trial conducted by a person with jurisdiction to preside (*Gomez v. United States* (1989) 490 U.S. 858, 876 [magistrate judge exceeds jurisdiction by selecting jury in a felony case]).

would be impossible to divine how a trial would have proceeded if a defendant had been allowed counsel or the trial judge not been biased."].)

Considering the principles of harmless and structural error, we are not persuaded that a failure to bifurcate under section 1109, if error, is unamenable to harmless error review. The admission of evidence on the gang enhancement allegations or special circumstance in an unbifurcated proceeding or joinder of gang-related and nongang-related charges does not affect the framework of the trial, and the effect of such admission on the outcome of a trial can be quantitatively assessed. (See *People v. E.H.*, *supra*, 75 Cal.App.5th at p. 480 [applying *Watson* harmless error analysis to § 1109]; *Ramos*, *supra*, 77 Cal.App.5th at pp. 1131–1132 [same]; see also *People v. Pinholster* (1992) 1 Cal.4th 865, 931–932 [applying *Watson* to a failure to sever a count], disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459; *People v. Burch* (2007) 148 Cal.App.4th 862, 868–869 [applying *Watson* to a failure to bifurcate trial on a prior conviction].)

### C.    Analysis

Section 1109's plain terms apply only to a "case in which a gang enhancement is charged under subdivision (b) or (d) of section 186.22" (§ 1109, subd. (a)), or "[i]f a defendant is charged with a violation of subdivision (a) of Section 186.22" (*id.*, subd. (b)). Section 190.2, subdivision (a)(22) makes a defendant eligible for either the death penalty or life in prison without the possibility of parole where the defendant intentionally killed, while an active participant of a criminal street gang, as defined in section 186.22, subdivision (f), and if the murder was committed to carry out the activities of the criminal street gang. Although section 190.2, subdivision (a)(22) incorporates the definition of criminal street gang found in section 186.22, subdivision (f), section 1109 does not refer to the special circumstance under

section 190.2, subdivision (a)(22) and does not require it to be bifurcated and tried separately from the substantive murder charge.

Similarly, although section 182.5 provides that a defendant who "willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of" a criminal street gang (as defined section 186.22, subdivision (f)) "is guilty of a conspiracy to commit that felony and may be punished as specified in subdivision (a) of Section 182" if the defendant actively participates in that criminal street gang with knowledge that the members have engaged in a pattern of criminal gang activity as defined in section 186.22, subdivision (e). Although section 182.5 specifically incorporates definitions from section 186.22, subdivisions (e) and (f), section 1109 does not refer to section 182.5, and section 182.5 is neither the gang enhancement created by section 186.22, subdivision (b) or (d) nor a violation of section 186.22, subdivision (a).

Defendant cannot demonstrate prejudice from failing to bifurcate his gang and firearm enhancements under section 1109 because the evidence of his gang participation was admissible to prove his motive for the murder, the section 190.2, subdivision (a)(22) gang special circumstance, and the section 182.5 participation in a criminal street gang (conspiracy) charge. All of the evidence admitted at defendant's trial would have been admitted even if the section 186.22, subdivision (b)(5) gang enhancement was bifurcated from the trial on his substantive charges. Defendant attempts to avoid this conclusion by arguing that the plain language of section 1109 applies equally to require bifurcation of the section 190.2, subdivision (a)(22) gang special circumstance and severance of the substantive section 182.5 charge.

" 'We first examine the words of the statute, "giving them their ordinary and usual meaning and viewing them in their statutory context, because the statutory language is usually the most reliable indicator of legislative intent." ' [Citation] ' "If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to

51.

determine the Legislature's intent is unnecessary." ' " (*People v. Albillar* (2010) 51 Cal.4th 47, 55 [discussing reputational benefit to the gang reputation, superseded by § 186.22, subds. (e)(1), (g).]) The plain language of section 1109 provides that bifurcation is required only for a gang enhancement "charged under subdivision (b) or (d) of section 186.22" (§ 1109, subd. (a)), and severance is required only when a defendant "is charged with a violation of subdivision (a) of Section 186.22" (§ 1109, subd. (b)). "Where there is no ambiguity in the statutory text, ' "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." ' " (*Albillar*, at p. 55.)

We agree that "section 1109, as currently written, does not apply to gang special circumstance allegations under section 190.2[, subdivision ](a)(22)." (*People v. Montano*, *supra*, 80 Cal.App.5th at p. 89.) We extend the court's statutory analysis in *Montano* to similarly conclude that section 1109 has no application to a violation of section 182.5. (See *Montano*, at pp. 113–114.)

However, even if section 1109 extends its provisions to section 190.2 and section 182.5, we nevertheless affirm defendant's murder conviction because we cannot conclude he was prejudiced by the failure to either sever the murder charge from the section 182.5 charge or to bifurcate it from the section 190.2 gang special circumstance or section 186.22 gang enhancement. Section 1109 does not bar the admission of gang evidence, and "it is likely some, though not all, of the evidence" would have been admitted to prove the murder charges. (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132; see Evid. Code, §§ 352, 1101, subds. (b), (c).) We cannot conclude it is reasonably probable defendant would have obtained a more favorable verdict because the gang evidence

52.

would have been admissible even if the murder charge was tried by itself. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)[35]

"[N]othing in Assembly Bill [No. ]333 limits the introduction of gang evidence … where the gang evidence is relevant to the underlying charges." (*Ramos*, *supra*, 77 Cal.App.5th at p. 1133.) Our Supreme Court recognized in *People v. Hernandez*, *supra*, 33 Cal.4th 1040 that "evidence of gang membership is often relevant to, and admissible regarding, the charged offense." (*Id*. at p. 1049.) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Ibid*.) " ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' " (*People v. Franklin* (2016) 248 Cal.App.4th 938, 953.)

In this case, defendant's gang connection was relevant to contested issues related to the murder because the motive for shooting Frank was gang related. Sergeant Sanchez testified that in July 2015, a street regiment commander had directed that all drop-out gang members be killed. We disagree with defendant that this evidence would not have been admissible evidence as to the murder charge, given it was a statement against penal interest and Freddie had dropped out. Freddie also testified that during July, other gang members had attacked him near his family home and Frank had fought the gang members to defend Freddie. Sergeant Sanchez testified that anyone who fought a gang member

---

[35]    Defendant argues generally that "[s]ince the gang enhancement and substantive gang crime should have been bifurcated, most of the gang evidence admitted in this trial was irrelevant to the issue of whether [he] was guilty of murder." He therefore concludes that admission of this evidence violated his right to due process. We disagree that section 1109's effect is to render the gang evidence irrelevant or inadmissible and reject the suggestion that a failure to bifurcate in this case violated the federal constitutional guarantee of due process.

would be considered an enemy of the gang as well. In addition, Prado advised Sergeant Sanchez that Prado had been instructed to kill Frank because Frank had committed crimes with the individual who ordered the shooting and the individual believed Frank was talking about the individual's crimes ("snitching"). Thus, the gang evidence was probative of explaining why defendant and Prado would have targeted Frank during the shooting.

While evidence as to the history of the gang or the two attempted-murder predicate acts may not have been admissible to prove motive, the trial court would have permitted the prosecution to admit evidence as to the other rules of the gang, which called for the death of drop-outs or cooperators and evidence that Prado and defendant were associates in the gang as part of the proof of motive. Evidence of Freddie and Frank's prior violence from gang members was also extremely probative as to the reason for Frank's murder. The other gang evidence that might not have been admitted had the trial been bifurcated was not so inflammatory that it likely biased the jurors against defendant on the question of guilt. Because the predicate acts introduced did not involve defendant, it is less likely that the evidence was prejudicial to defendant. In addition, as the predicate acts involved attempted murder, those crimes are no more prejudicial than the murder offense charged against defendant.

We disagree with defendant that his prior contacts with law enforcement would have been inadmissible because the evidence of motive was based upon defendant's involvement with the gang, and he admitted to gang association during these contacts. Furthermore, these contacts were not inherently prejudicial because the reasons for the contacts were not in evidence, there was no evidence that defendant had not committed a crime, and defendant was not arrested.

Additionally, the trial court provided a limiting instruction to the jury regarding their consideration of the gang evidence. (See *Ramos*, *supra*, 77 Cal.App.5th at p. 1132

54.

[" 'We presume that the jury followed these limiting instructions [regarding considering gang evidence for a limited purpose], and there is nothing in this record to rebut that presumption' "], quoting *People v. Franklin* (2016) 248 Cal.App.4th 938, 953.)

For these reasons, we conclude—even assuming that section 1109 applies to him—defendant was not prejudiced by trying the murder charge with the section 182.5 charge, the section 190.2 special circumstance, and the firearm and gang enhancements.

### D.   Retroactivity of Section 186.22

Effective January 1, 2022, Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill No. 333) amended section 186.22, subdivisions (e), (f), and (g). (Stats. 2021, ch. 699, § 3.) This amendment impacts several of the jury's findings in this case. The jury found true the special circumstance that defendant intentionally killed while an active participant in, and to further the activities of, a criminal street gang as defined in section 186.22, subdivision (f) (§ 190.2, subd. (a)(22)). The jury found true that defendant committed a felony punishable by life in prison for the benefit of a criminal street gang (§ 186.22, subd. (b)) and that a principal personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (d), (e)(1)).

The jury also found defendant guilty of participation in a criminal street gang pursuant to section 182.5, which provides that a person who actively participates in any criminal street gang as defined in section 186.22, subdivision (f) with knowledge that its members engage in or have engaged in a pattern of criminal gang activity as defined in section 186.22, subdivision (e), is guilty of conspiracy to commit that felony and may be punished as specified in section 182, subdivision (a).

Despite these changes, defendant has not argued that the amendments to section 186.22 should be applied retroactively to overturn the true special circumstance finding, firearm and gang enhancements, or his section 182.5 conviction. This is most likely because, as we observe, the evidence presented at trial was sufficient to sustain the

gang-related elements of defendant's case even under the revised requirements of section 186.22 and any error from failing to instruct the jury under its amended provisions is harmless.

Because Assembly Bill No. 333 essentially added new elements to the substantive offense and enhancements in section 186.22, this section is retroactive under *In re Estrada* (1965) 63 Cal.2d 740: "When the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.) The Supreme Court has expanded the application of this doctrine broadly " 'to statutes changing the law to the benefit of defendants' " and held that the presumption of retroactivity applies to laws that change the substantive requirements for an enhancement in the defendant's favor. (*People v. Sek* (2022) 74 Cal.App.5th 657, 666, quoting *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 300–301 [applying recently passed initiative requiring proof of intent to kill for certain special circumstance allegations retroactively to the defendant's case that was not yet final].)

When jury instructions are deficient for omitting an element of an offense, they implicate the defendant's federal constitutional rights and we review for harmless error under the prejudice standard articulated in *Chapman*, *supra*, 386 U.S. at page 24. (*People v. Sek*, *supra*, 74 Cal.App.5th at p. 668; *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1090; *People v. E.H.*, *supra*, 75 Cal.App.5th at pp. 478–480.) Under that standard, the absence of jury instructions affected by the amended version of section 186.22 requires reversal unless "it appears beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict." (*People v. Flood* (1998) 18 Cal.4th 470, 504.)

On this record, we conclude the jury instructions were harmless beyond a reasonable doubt. The prosecution's evidence proving the "pattern of criminal gang activity," "criminal street gang," and "common benefit" satisfies section 186.22, subdivisions (e), (f), and (g), as amended by Statutes 2021, chapter 699, section 3.

First, Frank's murder must have been committed to benefit the street gang under the new definition in section 186.22, subdivision (g) that provides examples of a common benefit as including "retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).) Here, the prosecution's evidence and argument focused on Frank's murder benefiting the gang because it was retaliation for Freddie dropping out of the gang, Frank defending Freddie in altercations with other gang members, and also retaliation against Frank who the gang believed was informing or speaking about earlier crimes he committed with the gang member who instructed Prado to kill Frank. The prosecution's evidence thus proved that the murder benefitted the criminal street gang in a manner that was more than reputational.

Second, the prosecution's evidence as to the "pattern of criminal activity" was proven even under the narrower definition in section 186.22, subdivision (e). Under the newly amended law, the last of the predicate offenses must have "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed." (§ 186.22, subd. (e)(1), as amended by Stats. 2021, ch. 699, § 3.) In this case, the prosecution provided evidence of two predicate crimes occurring in 2013 and 2015.

The predicate offenses are now required to have been committed by gang "members" and must have been for the "common[] benefit[] [of] a criminal street gang." (§ 186.22, subd. (e)(1).) The prosecution presented evidence that two Brown Pride Catella members stabbed a rival gang member in 2013 and were convicted of attempted

murder and a gang enhancement. In June 2015, Prado and two other Brown Pride Catella gang members were driving when they came upon a drop-out gang member and shot him multiple times. Prado was subsequently convicted of "attempted murder with a street gang."

Section 186.22, subdivision (g) now defines "common benefit" to include "retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant" and is satisfied in this case by the 2013 (two gang members targeted and stabbed a rival gang member) and 2015 (three gang members retaliated against a gang member who dropped out of the gang) predicate offenses. Although section 186.22, subdivision (e)(1) has a narrower list of offenses that may be used to establish a pattern of criminal gang activity, it still includes attempted murder—the 2013 and 2015 predicate offenses proven in this case. (Compare former § 186.22, subd. (e)(1)–(33) with § 186.22, subd. (e)(1)(A)–(Z)). Thus, the prosecution proved that the predicate offenses commonly benefitted Brown Pride Catella and the benefit was retaliation and targeting a perceived gang rival.

While the jurors were permitted to consider the current murder offense in determining whether the prosecution had proven a pattern of criminal gang activity, we find that the evidence of two prior predicate offenses was not disputed and the jury would have found this element satisfied even if provided instruction not to consider the currently charged offenses.

An erroneous or missing instruction on an element of an offense is harmless beyond a reasonable doubt where it relates to a matter that was uncontested or proved as a matter of law. (*People v. Merritt* (2017) 2 Cal.5th 819, 832.) We conclude beyond a reasonable doubt that the evidence of the "criminal street gang" and "the pattern of criminal gang activity" were uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same even if instructed under the requirements

of section 186.22, subdivisions (e), (f), and (g), as amended by Assembly Bill No. 333. In addition, the prosecution did not argue that the "common benefit" was only reputational and, therefore, the changes to the definition of "common benefit" do not affect the jury's verdict.

## DISPOSITION

The judgment is conditionally reversed. On remand, the trial court shall set a hearing in accordance with Code of Civil Procedure section 237 to consider whether to disclose juror information. If, after the hearing, the court declines to do so, it shall reimpose the original sentence. If the court instead discloses juror information, it shall provide defendant a reasonable amount of time to file a motion for new trial. If defendant does not timely file a motion for new trial, or if the court denies his motion, the court shall reimpose the original sentence. The judgment is affirmed in all other respects.


HILL, P. J.

WE CONCUR:


FRANSON, J.


PEÑA, J.

59.